My name is Stephen Bolzomi. I am here to represent Robinette Amaker, the appellant in this matter. I'd like to reserve four minutes for rebuttal. This case involves the rights and responsibilities involved in the wrongful handling or mishandling of the remains of deceased in Washington State. Specifically, the court will have to address whether an entity or entities that willfully harvest organs and body parts from the remains of the deceased without any contractually or statutorily required consent may do so without any accountability under the law to the survivors of the deceased or to anybody else. Briefly, Bradley Gerlich died on October 13, 1998. He died intestate, so there was no will specifying the disposition of his remains. His body came into the custody of the King County Medical Examiner. At this, four years earlier, the King County Medical Examiner and the Stanley Medical Research Institute of Bethesda, Maryland had entered into an agreement by which Stanley would fund a full-time pathologist at the King County Medical Examiner's office. In return, this medical examiner would work 75% of the time for King County for pathology duties and 25% of the time for Stanley duties. Stanley was engaged in the study of mental illness and made these arrangements with King County and other entities across the country in an attempt to harvest brains for the study of mental illness. The contract between Stanley and King County provided that King County, this medical examiner, would not harvest any brains without the consent, statutorily and contractually required consent, from either the deceased by virtue of a pre-death anatomical gift or by the survivors of the deceased pursuant to applicable laws, in this case RCW 68.50. The supervision of this pathologist was conducted by both Stanley and by the King County Medical Examiner's office. Now, turning back to Bradley, his autopsy occurred on October 16, 1998. The pathologist was King County's Stanley funded pathologist, Sigmund Menschel. The survivors of Bradley Gerlich at the time included his maternal aunt, Terry Wright, who survived in Seattle, his father, Robert Gerlich, who resided in Florida, and his sister, my client, Robinette Amaker, who was in the military and also resided in Florida. Several years before this, Bradley and Robinette's mother had passed away and apparently the family had some issues about disposition of the remains. So they got together and talked to each other and agreed with each other that they would carry out each other's wishes for the dispositions of their own remains. Robinette had agreed with Bradley that if Bradley passed away before she did, she would arrange for taking his body from wherever it was and taking it to Fort Snelling, Minnesota, to be buried next to their mother. So when Bradley died, Robinette came to Seattle to put those wishes into effect and take those actions. In the meantime, Dr. Menschel learned that there were issues that indicated Bradley may have suffered from mental illness, so he thought Bradley's brain would have been suitable for harvesting and donation to the program. His testimony is that he attempted to contact Robert Gerlich but was unsuccessful. He says he made telephone contacts. There's no such evidence in the record of any telephone contacts. He claims he sent a letter with a blank consent form to Robert Gerlich. There's no copy of the letter or a blank consent form sent to Robert Gerlich. He also claims he spoke... There's no evidence of it. We just don't have any evidence that it was sent other than he says. Well, yeah, that's correct, Your Honor, and I would submit respectfully that the inference that he didn't do it must be drawn in favor of my client as... Well, I appreciate that. I guess I'm really interested in a couple of issues, but I'm wondering on these couple of issues. Number one, as to whether your client has any standing in this particular case, and as to number two, you know, the second part of this is, does the Washington Anatomical Gift Act create some kind of a private action? Is that something that a Ninth Circuit Court of Appeals ought to be deciding, or should we send this over to see what the Washington State Court ought to say? As the Court is aware, I'm sure there is a motion pending to certify this to the Washington State Supreme Court, and earlier this spring we argued the companion case, Adams v. King County, which the Washington Supreme Court has and is considering for a decision right now, and of course... Will that case answer these questions? It will answer the second question. It probably will not address the standing issue because that identical issue is not raised in the Adams case, but the right to sue under the Anatomical Gift Act certainly will be decided by the Washington Supreme Court as it's before them. Well, I just wanted to make sure your opinion on that. I mean, my worry is that we could spend a lot of time suggesting that whether your client has standing, there's no question that on the prearrangement right to control, Washington law would put your client behind her father, correct? At the time of death, yes, Your Honor. So at this particular point in time, that's, of course, their argument, that you don't have any standing because his father wanted to do anything about it. He had the chance to do it and didn't. Well, our position, of course, Your Honor, is that the statutory right to control the remains of the deceased, which the trial court ruled controlled standing, isn't what controls standing in this state. I understand. Again, Washington law. Yeah. Well, this case is all Washington law, Your Honor. There really isn't any federal law involved. It's here because of, I guess... As I understand it, the father was never found incompetent. He was never adjudicated incompetent. He lived by himself. That's the evidence. Took care of himself. Had a driver's license. There's evidence of suffering from K-2, which affected his competence, but what you stated is in the record as well. And he flew to Minnesota by himself. So, yes, Your Honor. But he was not aware that the brain tissue had been harvested at the time of his death, correct? That is correct. And Judge Peckman ruled that for all purposes under the statute he was unavailable at the time and that under the statute itself, the Uniform Anatomical Gift Statute, that Robert Ed Amaker had the ability, because he wasn't available, to make an anatomical gift of Bradley's remains. And so we have this conflict created by the ruling. On the one hand, Robert is supposedly the only person who has the right to dispose of the remains, yet on the other hand, Robert Ed Amaker could make a gift of all of the remains, which under any conception of the term dispose of the remains would mean the same thing. And so we have this tension between the meaning of the statutes created by the trial court's ruling, and that leads to the true vice of the trial court's ruling, because standing under Washington law isn't controlled by the statute that gives right to the survivors of the decedent to control the remains. Standing under Washington law, controlled by Washington common law, the Gadbury case and its progeny, Gadbury said that those who by relation with the deceased have a particular interest in seeing that the last sad rights are properly given are those who have standing to sue for tortious interference with the remains of the deceased. And I think all parties would agree that the real heart of this case and the heart of the court's ruling is the right to sue for tortious interference. No one disputes that the tort of tortious interference survives to the present day. The question is here whether, as framed by the trial court's ruling and by the defense, whether this statute, RCW 6850160, somehow overruled Washington common law precedent, giving standing to those with a particular interest in seeing that the last sad rights are properly given. If we apply that test, there's no doubt that Robinette Amaker had standing. She was his sister. She was the one who took control of the remains after the King County medical examiner finished with them. She arranged for cremation. She flew them to Minnesota. She agreed with Bradley before his death that she would do this. And so at that time, she was the one who had that interest. And just because she was. Again, we have to decide what the purpose of it is. But as I view that question through the lens of who's entitled to bring a cause of action, the fact that she was taking the actions doesn't mean that she would have had the right in the first instance that she was acting at the request or at the direction of the person who does have the interest, ordinarily the next of kin, which would be her father. And so the question we're faced with is whether under Washington common law, the ability to proceed on that cause of action is limited to that next of kin or can be expanded to whoever that person, the father, may have assigned responsibilities to. One thing that's puzzled me throughout here is that since it's clear the cause of action exists in Washington, somebody has it. If it is narrowly limited to next of kin, that would suggest your father and subsequently your father's estate, yet no claim appears to have been brought on behalf of her father's estate. Can you speak to that? No claim was brought on behalf of the father's estate. That's correct, Your Honor. But if you look at the way Washington common law has framed the class of persons and the interest to be protected, the interest to be protected is the sensibilities and feelings of the survivors, plural, not just the survivor. And there isn't a single case in Washington jurisprudence that said only the next of kin. If you look at all of the other cases. What case do you have that says it's other than the lawful custodian of the deceased body? Gadbury v. Blights. Well, Gadbury really talks about a mother and a father, and the mother or the father ought to be able to do whatever they ought to do. We haven't got that situation here. We haven't got one parent or another. We've got a daughter. And in this particular situation, a lawful custodian of a deceased body is the only thing that I can read out of Wright v. Beardsley, which is a 1907 case. I'm reading into the wee backs of history of Washington law to try to come up with this. And you cite me Gadbury case, but that just talks about two parents. We're not talking about a daughter now. That's a different. I mean, in Idaho, we have a certain amount of people who can sue for wrongful death. You've got a certain group, and if you're not in that group, you can't get there. So I'm bringing that context to this case. If we're looking at the lawful custodians, and I look at Washington law, I don't have her being a lawful custodian until the parent is gone. That's my worry. So that's why I keep saying, boy, the Washington Supreme Court wants me to decide this. And I guess that's because my worry is there's never been anybody suggest that this father shouldn't be the only one to bring this. Under Washington common law or statute. Of course, we wouldn't be addressing this problem if Robert were alive at the time that these facts came to light. Well, that's why my colleague's question is important, and that's why I wondered. Why didn't the estate of Robert do something? It's not in the record, Your Honor. There really isn't an answer. The short answer to that is the estate of Robert didn't, and Robinette did. She was the next of kin at the time that these issues came to light. And that really brings up the issue that also raised in these pleadings is the whole concept of accrual. The suggestion is that the cause of action died with Robert, and under Washington law, a cause of action never accrues until the injured person knows all of the elements of the tort, and obviously knowledge of the misconduct that occurred is a critical element of the tort. Robert Gerlich was not alive when those came to light. Robinette. I don't find under Idaho discovery exceptions to the statute of limitations that the discovery exception accrues to the benefit of someone who was not allowed to bring the tort action in the first place. The discovery doesn't increase the amount of people who are supposed to be allowed to bring the tort. It only gives those who are supposed to bring the tort an added time to bring it, and therefore, again, we're back to why didn't the dad do something or his estate? Well, I would agree with you that the Green case didn't exist, Your Honor, and the Green case answers that question, and the court didn't give us a great deal of explanation, but the Green case involved the husband of a woman who was injured when she was a fetus, and when he obviously married her later and the harm caused by the DES came to light after their marriage, and this husband had no cause of action, obviously, and his wife is developing in the womb. He didn't even know his wife existed if he was alive, and our Supreme Court held that his action accrued at the time that the harm became apparent, and at that point he had the right to sue. He had standing. He had the right to sue, and that is Washington common law. That's the same situation here. Robinette Aniker arguably had no right to sue for anything if we accept the premise that Robert was the only one who had the right to sue at the time of death. Eight years later or seven years later, the cause of action comes to light. The cause of action accrues. If we're going to assume that the next of kin is the only one who can sue, she is the next of kin. So Green supports the position that we're asserting here, and that's longstanding Washington common law. That's never been resolved. Perhaps maybe that's another reason why the Washington Supreme Court should address this to tell us whether Green goes that far. Frankly, when we got the result in Green, it was a result we were hoping for, but we felt like we hit one over the fence on that, but that's what the Supreme Court said. I see I have four minutes left, so I'd like to reserve the remainder of my time. If you may. If you may please the Court, I'm Grant Deginger. I'm representing the respondents in this case, King County, the Stanley Medical Research Institute, and Dr. Folger Torrey. Just by way of brief background, Stanley Medical Research Institute is a nonprofit charitable organization that supports research on schizophrenia and bipolar disease. It provides tissue free of charge to researchers. We believe the district court correctly concluded that the appellant did not have standing to assert a cause of action for interference with a corpse, and that the Anatomical Gift Act does not include either an express or implied cause of action. We also believe that the district court was correct in concluding that the appellant failed to establish causes of action for invasion of privacy and for civil conspiracy. I just wanted to refer back to a couple of the key facts that Mr. Busomi didn't mention, because they relate to some of the questions the Court had. And that was that Mr. Gerlich, Robert Gerlich, was alive at the time of his son's passing, as was discussed. He provided several weeks after the death of Bradley a written authorization for Terry Wright to have Bradley's personal effects released to her. So he was acting as the next of kin during this time period. I think it's relevant. Also, Ms. Amaker understood that her father was the next of kin at the time. She said that in her deposition that's in the record. And also at the time that she made arrangements for her brother's cremation, that she acknowledged that her father was the next of kin in that document as well. So it's pretty clear that this is a situation where it was understood that Robert was, in fact, the lawful custodian of the body. And I think that's where I think some of the Court's questions were. Clearly, Washington law establishes that there's the appellant doesn't have standing for a claim for interference because our common law has long recognized that there's a discrete class of persons known as the lawful custodians or the next of kin who are responsible for the body and its disposition under RCW 6851.60. The Wright case, which the Court was talking about, Mr. Bosomi, is the case that really recognized that because it said that the persons who were the lawful custodians are the persons who may maintain an action. Well, that does say persons plural. Does that suggest that it's not simply the individual next of kin? Well, it could. You know, in situations where the parents of a child that's deceased are alive, it could well be the parents are the same because they would be in the same class of people under RCW that's recognized now under RCW 6851.60. So in this case, Bradley's mother had pre-deceased him, so therefore, Robert Gerlich was the only surviving parent and he would be the only person in that class. And clearly, he had the rights under the common law and under the statute. I don't think the Gadbury case changed that rule at all. In fact, it's pretty clear that it didn't. Clearly, in that case, the mother was the person who was found to have the right in that case. So do you agree with the proposition that the father's estate was the only entity that could have properly brought this case? If there was harm. Now, the other thing to remember, in the record, the record does not indicate that Robert disagreed with the action. In other words, there's no evidence that he was opposed to the donation. There's no evidence, unfortunately, that he had confirmed it. So we have a missing fact there. But the bottom line is, if he was alive today, only he would have a claim, if he disagreed with it, if he agreed with the donation. Well, that still begs the question, okay, he's not alive today. Does his estate have a claim? If the estate had some basis to argue that it, that there was. . . I don't know that they've got an affirmative obligation to prove that he was opposed. I mean, under the circumstances, the burden would ordinarily lie on your clients to document that consent was obtained. And we're not at that stage of the case, but so far nobody's holding anything up saying that here's evidence that proper consent was obtained. So at this point in time, considering simply the question of who's entitled to bring an action, it seems to me at a minimum you have to acknowledge that his estate is a potential plaintiff against that claim. The question that, the harder question for you is what is it under Washington law that closes the circle to limit it to only the individual next of kin? And part of my difficulty with this case is trying to figure out exactly what the injury is. Who's the injured party? I mean, are we talking about really the deceased being the injured party because of whatever is done to his remains, and under the law trying to figure out who passes to that claim? Are we referring to the anguish suffered by the person responsible for setting up the funeral, which is the kind of language that's used in Gadbury, but in the context where that person is the next of kin, so the court's really not addressing the question we have here? I mean, both of you are good lawyers. If there was good Washington law speaking to this, we would have heard about it. Our problem is that there's not a whole lot. We're grasping at straws here. So that's why I go back to first principles. Who's the injured party really, and why don't we try to – what's the purpose behind the limitation that the common law imposes to only letting certain people bring an action for that? Well, I think the overriding interest in the common law was to, one, establish who was responsible for the right to control the body and the obligation for the costs associated with the burial. That's probably where it goes at the very outset. The question of what's the injury and who is injured, what we have here is a question of – there's not a question about desecration. This was a situation where there was a request for a donation. There was an autopsy. So there was going to be, unfortunately and sadly, a requirement that there be invasive activity involving the body, and that's not an issue here. That's never been the issue in the case. The way that Robert died, the law required the autopsy. Absolutely. So the question here is, you know, is if there has been an injury, I guess that's the question the Court is asking. And I guess what I would say is if Robert Gerlich agreed that the donation was a good thing to do and he was supportive of it, there wouldn't be any injury. And the reason that that's important and the reason the statutory structure is such that family members may disagree about what should happen with respect to the remains of the deceased. Some family members might support cremation. Some might not be supportive of cremation. So there needs to be somebody that makes that decision that can provide that finality and that kind of certainty in those kinds of cases. So it seems to me that's what the common law provided, and I think what the statute also provides is a point where somebody makes that decision in the family because there could be differences of opinion. Well, the statute, and I think you've argued this yourself, the statute has a somewhat different purpose. The statute is really designed to encourage donations, and because of the time-sensitive nature of that decision after somebody's demise, it consciously expands the circle of people that have authority to act. And you certainly are not arguing that the common law right to sue is coextensive with the people allowed to give permission under the statute. Exactly. We're talking about two different statutes with two different purposes. RCW 6851.60, which is the one relating to who identifies as the next of kin, addresses the question of responsibility for final disposition of the body. The Anatomical Gift Act has a different structure, and that is, who do you look for to answer one very specific question, and that question is, is there going to be a donation of tissue in this case? That's the limited purpose for which that statute exists, and it provides the hierarchy as well. But the only question that's being asked is, is there a decision that's going to be to facilitate a donation? And, in fact, if someone's unavailable, the question then is, is there somebody else available? But it provides immunity to whoever makes that decision at that time. 160 doesn't in the other situation where you have the issue of final disposition of the body. So here we are buried in questions of Washington law, citing cases that are going on 100 years old and trying to infer from bits and pieces. And your colleague across the aisle has suggested it might be appropriate to ask the Washington Supreme Court to weigh in or perhaps wait for the Washington Supreme Court to speak in the case that's been presented to it already at a minimum. What's your position on those suggestions? Well, I'd like to address both of them, the first one being the question about the tortious interference, whether they're standing. Although these cases are old, this is not an area of the law that has changed much over time. And it looks to me, our view is that the statute itself really provides clarity and is consistent with what the common law has been for a long time. So in terms of this development of tort law, it seems that the law is very well settled, and in Washington there hasn't been a need to revisit this issue. I don't think this is one where courts are looking at issues to have reviewed. Obviously, the appellants didn't seek to have this certified at the trial court level. They were comfortable that the law that existed was sufficient to address the case, and certainly we would agree with that as well. With respect to the Anatomical Gift Act, certainly we have, as Mr. Bozzone said, there was a case that's pending that addresses that issue. Since there's two, really, two issues that are embedded in that. One is whether there's any express right of action under the Anatomical Gift Act, and it's pretty clear that there isn't. So the only question then is, can this Court apply the Bennett test to determine whether there's an implied cause of action? This Court has done that in the past, so it's found it quite able to do it. We believe that the Court can do that. And when one looks at the factors, it's pretty clear. The first test under Bennett is the question of whether there was a – whether the statute was enacted to increase donation – whether the plaintiff is in a special class for which the legislature tried to create a special benefit. Clearly, that's not the case here. The statute itself in RCW 685520 has a legislative declaration of what the purpose is, and that's to increase the amount of donations. The second part of the test, which is did the legislature express an intent to support creating a remedy, again, there's no evidence that the legislature intended to do that. In fact, it provided immunity provisions to facilitate donations. So the evidence is the opposite. I think the other thing is that the legislature has looked at this statute subsequently and has not chosen to add a remedy at all. Finally, the main question, the last part of the Bennett test, which would be whether implying a remedy would further the underlying purpose of the Act. And clearly, the underlying purpose of the Anatomical Gift Act is to facilitate additional donations and to – given that there are many provisions in there that try to preclude further litigation by creating immunities, it seems to me that that test under those three parts would show, as the district court correctly concluded, that there would not be a basis for implying a cause of action. So this Court has addressed this kind of issue in the past, and it's a fairly straightforward test, one which the district court had difficulty with. As I've spoken before, the two statutes that we're talking about have slightly different purposes. One is to provide a fast and available way of making decisions about donation. The other one provides this question of clarity and finality. And I think that that's important, and that is why probably there hasn't been a lot of litigation on this issue in the – over the intervening hundred years since the Wright case was decided. That has value. It has value to families. It has values to those that deal with families at times like this where a situation is difficult and where family members have to make decisions. There needs to be that kind of finality. We haven't seen in Washington tort law the notion of expanding rights in this way. Now, I did want to respond to something that Mr. Pizzoli said with respect to accrual of causes of action, because I think it's important to note that what we have here is a situation where the appellant is arguing that there should be a transfer of this cause of action, essentially. And that is not the case. And the discovery rule has not been used in Washington to create causes of action. It's not – that's not been its purpose. It's been its purpose to address the opportunity to determine when a plaintiff who actually had a claim at the time the alleged tort occurred knew or should have known all of the information sufficient to bring a cause of action. The Green case I don't think really addresses that. The husband in the Green case had a loss of consortium claim, so it didn't relate back to the plaintiff's claim. It would only relate back to a period of time when he knew or should have known that he had a claim. Lastly, the – I just wanted to briefly identify that there were two other claims here in the case. One was the claim for invasion of privacy. Let me ask you one question before you move there. Sure. As I read the district court's decision, the district court found that there was no cause of action for a common-law tortious interference with a dead body, didn't there, Mr. Washington? He says, well, plaintiff asserts a claim for common-law tortious interference with a dead body. Plaintiff asks this court to create a new state cause of action based on restatement second of torts, section 868. He says, I haven't found out. I haven't found anything under that. But that doesn't seem to be the issue presently set before me. No. There was an attempt to assert that at the trial court level. The court didn't believe that there was a cause of action under the restatement. The restatement really focuses, ironically, focuses the right only on the legal next of kin, the legal custodian. But it appears that the plaintiff had not pursued that claim on appeal. All right. Thank you. I just wanted to make sure that was the way it was. So the last two causes of action that were alleged were the claim for invasion of privacy, which we don't think was sufficient. The Crusa court determined that the plaintiff had not met the standard of determining that there was any publicity given by the defendants in this case, which is one of the two elements that they have to establish, communicating to a large number of people any information about the decedents or any unusual circumstances for egregious conduct. So we believe that the trial court was correct in its decision in that regard. We also believe the trial court clearly and correctly dismissed the conspiracy claim because there was no evidence of any of the necessary elements of conspiracy. If the Court doesn't have any questions about those two causes of action, then I'll complete my remarks. Thank you. Addressing some of the points that came up, we were continually faced with the question of whether RCW 68.50.160 somehow controls standing to sue for tortious interference. And the only case we found in the country that really addressed that issue was the Christensen case out of California, where a number of families and members and friends of the deceased sued for wrongful handling of the remains. And that defense was raised in that case, saying that California equivalent to Section 160 was what controls standing. And here's what the court from California said. We disagreed. Provision by the statute for the disposal of human remains and the imposition of duties and recognition of priority of right does not reflect legislative intent or policy to protect the Section 71 right holder, the person with rights to the custody of the remains, or contracting party from the emotional trauma that may result from mistreatment or desecration of human remains. The statutory scheme establishes only an orderly process by which to ensure that proper disposition is made of human remains. That's the only statement in the country that we found that addresses directly that issue of what is the intent of the statute governing the right to dispose of the remains of the deceased. And I assert that that would apply here. There's nothing in the legislative history that's been submitted to you that indicates that Section 160 controls or is intended to control anything more than the orderly disposition of the remains of the deceased. Certainly, given the time, the hundred years or more that have passed since the Wright and Gadbury cases, you know, if the legislature thought that it needed to overrule those cases, it would have done so in a more explicit and clear-cut manner. Again, we... Do you stand on... I guess part of my confusion here is that I'm not sure that Wright and Gadbury are all that helpful to you in expanding the circle of who can proceed with the lawsuit. I mean, the people there, Gadbury in particular, which is talking about who can sue, but it does appear to me the question is whether the mother can sue by herself because the father is no longer... He's not dead, but he appears to have skipped out. That doesn't suggest that somebody other than a next of kin would be able to bring the suit. I agree with you, Your Honor, to the extent that we're discussing whether Wright and Gadbury really discuss standing, and they don't. In both of those cases, it happened to be the next of kin. In neither case was there an argument or a decision whether it is only the next of kin that get to sue. In those cases, they tried to interpose obstacles to the next of kin suing. I believe it was in Gadbury where the adult son was alive, and they tried to say because the adult son was alive, the mother couldn't sue, and they said, yes, the mother can because there were some statutory rights given the adult son some sort of statutory interest in some aspect of burial. So is there anything in Washington law that supports the proposition that somebody who acknowledges she's not the next of kin can bring such a claim? Well, there's no case that says exactly what you say, Your Honor. I think you have to look at the interest that's being protected, the statements of policy by the courts about why they and how they protect those interests, and you have to look at the facts of the case, and you have to consider the concept of accrual, even though it doesn't directly involve a statute of limitations issue. If you accept the notion that only the next of kin can bring it, then you have to decide whether this case ever accrued during Robert Gerlich's life, and it didn't because he never knew about it, and there's no authority to suggest that he died with him. The only authority cited to you about that issue is green, which supports cause of action accruing at the time knowledge has occurred. My worry is, and I bring this up again because I asked counsel about it, I wanted to ask you both in your time you had gone, the district court talks about two claims under common law tortious interference with the dead body. He says plaintiff asserts a claim for common law and tortious interference with the dead body. Plaintiffs ask this court to create a new state cause of action based on restatement of tort section 868, and he says Washington has never adopted that, and I'm not going to do it. Then he says plaintiff's briefing on summary judgment suggests she's bringing a second separate common law claim for tortious interference with the dead body based on two old Washington Supreme Court cases, the one I've now been talking about, and he says she didn't amend. Then we had a motion for reconsideration, and on the motion for reconsideration, he says she had no standing. So if we're really looking at the claims brought under Wright v. Beardsley and Gadbury v. Blights, then it seems to me I have to focus in on the language of those, don't I? Yes, you do, Your Honor. And they say, as I understand it, and reading them very carefully, that Wright says the persons who are the lawful custodians of the deceased body. That's all it says. If that's the only common law claim we've got, then we are limiting to custodians. That statement in Wright wasn't critical to decision of the case. I don't know if I'd quite characterize it as dicta, but if you're going to take that statement in Wright because it wasn't the issue decided, then there's no reason to disregard the statement in Gadbury that talks about the class of persons that are able to sue. Well, but Gadbury wasn't dealing with that. Gadbury, as we've suggested, is only can the mother go without the dad. They would both be lawful custodians of the deceased body. So my worry is that you didn't appeal, as I understand it, and that's what I'm giving you the chance to tell me. As I understood it, you didn't appeal their decision, the district court's decision, about a common law claim based on the new ideas in common law claims in this area. Because Washington didn't adopt them, the district court threw it out. The only thing you've got is that which is under Wright v. Bursley or as amended by Gadbury. That's all that's in front of me. That's correct, Your Honor, and the parties have agreed on that. May I conclude? Please. This is a case involving a clear wrong, a clear act of misconduct with no excuse. The defense has offered no excuse for taking Bradley Gerlich's brain without any consent. That's what occurred here. None. And they haven't disputed that that type of act can cause harm. The law protects the interests that are harmed here. Washington common law has long protected it. This is an unregulated area, this whole idea of organ donation and what are the rights and responsibilities. And you're being suggested a state of affairs that where the interests of the donors and their families have no protection and the only rights to be protected are the interests of the donees. And that's an unbalanced state of affairs that's contrary to the Uniform Anatomical Gift Act. Without any accountability and integrity. I ask you to conclude, not to give us a new speech. You're well over time. We ask for reversal. The case just argued is submitted.
judges: Clifton, Smith, Sandoval